# United States Court of Appeals
## For the First Circuit

No. 22-1665

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ LUIS MELÉNDEZ-RIVERA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Thompson, Circuit Judges.

Franco L. Pérez-Redondo, Assistant Federal Public Defender,
Supervisor, Appeals Section, with whom Héctor L. Ramos-Vega,
Interim Federal Public Defender, District of Puerto Rico, was on
brief, for appellant.

Maarja T. Luhtaru, Assistant United States Attorney, with
whom W. Stephen Muldrow, United States Attorney, and Mariana E.
Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate
Division, were on brief, for appellee.

June 4, 2025

**THOMPSON, Circuit Judge.** After José Luis Meléndez-Rivera (Meléndez) and a criminal associate attacked two victims during a carjacking, causing serious injury by way of a gunshot to one of those victims, Meléndez was arrested and charged accordingly. He negotiated a plea agreement with the government, and the district court pronounced sentence thereafter. But Meléndez says two big problems arose at different junctures during sentencing: the government breached the plea agreement, and the court's upwardly variant sentence was procedurally unreasonable. For reasons we explain in the pages to follow, these appellate contentions do not carry the day. We therefore affirm.

## I. BACKGROUND

As usual when, as here, a sentencing appeal follows a guilty plea, we draw the pertinent facts from the plea agreement, each change-of-plea hearing,[1] the unobjected-to presentence investigation report (PSR), and the sentencing hearing transcript. See United States v. Diaz-Serrano, 77 F.4th 41, 44 (1st Cir. 2023).

### A. The Offense Conduct

One evening around late January 2018, Meléndez and Kevin J. Aponte-Pelaez (Aponte) approached a parked Ford F-250 truck in

_____

[1] The appellate record does not include transcripts for the change-of-plea proceedings. See United States v. Morales-Cortijo, 65 F.4th 30, 32 n.1 (1st Cir. 2023) (noting same issue). But the record does contain the docketed minutes of Meléndez's change-of-plea hearings, so we look to those.

Bayamón, Puerto Rico, brandishing firearms. Inside the truck were two occupants -- a woman (seated in the driver's seat) and her father (seated in the backseat). Aponte opened the driver's-side door and pulled the woman out of the truck and to the ground by her leg. Meléndez went to the back seat and told the father, "Get out of the vehicle. We are stealing this vehicle." The father pulled out the pistol he owned and shot in Meléndez's direction. Then the father grabbed Aponte (who was in the driver's seat by then) by the neck and attempted to shoot him, but the gun did not discharge. A shootout between the father and Meléndez ensued, during which Meléndez shot the father in the face. Meléndez and Aponte fled on foot.

## B. Indictment and Plea Agreements

Soon after, Meléndez was arrested and charged with carjacking resulting in serious bodily injury, 18 U.S.C. § 2119(2) (Count 1), carrying and discharging a firearm during a violent crime, 18 U.S.C. § 924(c)(1)(A)(iii) (Count 2), and possessing a firearm and ammunition as a convicted felon, 18 U.S.C. § 922(g)(1) (Counts 3 and 4).

Meléndez entered a plea of not guilty, but, in time, moved to change that plea. This is because, as part of his negotiations with the government, Meléndez agreed he would plead guilty to Counts 1 and 2 in an agreement pursuant to Rule

11(c)(1)(C),[2] and the government agreed to ask that Counts 3 and 4 be dismissed. The agreement recommended the court impose a sentence of 166 months of imprisonment for both counts.

At the change-of-plea hearing, Meléndez "was found competent to plea" and he "agreed to plead guil[t]y to counts One (1), and Two (2) of the Indictment" (in context and in light of what followed procedurally, we take the docket's minute-entry language to mean the court accepted Meléndez's guilty plea). But the sentencing court did not accept the plea agreement, indicating it needed to see a PSR before it could make a decision. The court explained Meléndez could withdraw his guilty plea if the court ultimately rejected the agreement. Following probation's submission and the court's review of the PSR, the court did not accept the plea agreement. The court denied Meléndez's ensuing motion for reconsideration, and Meléndez withdrew his plea.

A pretrial conference followed, where the parties agreed there was interest in negotiating a new plea agreement. In the course of that discussion, the court emphasized Meléndez's criminal history category (CHC) of 5 and, in response to defense

---

[2] In return for a guilty plea in this kind of agreement, the government agrees the proposed sentence or sentencing range is the "appropriate disposition of the case" or that a particular sentencing factor, policy statement, or provision of the sentencing guidelines does or does not apply. See Fed. R. Crim. P. 11(c)(1)(C). A sentence recommendation in a Type C agreement is binding on the court, should it accept the agreement. Id.

counsel indicating he was trying to "move" this "old case" along, the court remarked, "Well, one of the things that are not moving very well is the victim's face." The conference concluded with the scheduling of another conference, with plans to turn it into a change-of-plea hearing if the parties reached an agreement in the interim.

Several days later, they did reach another agreement, this time pursuant to Rule 11(c)(1)(B)[3] and only as to Count 1 (the government agreed to dismiss the remaining counts at sentencing). As relevant for our purposes, here's what that agreement entailed. The parties did not stipulate to a CHC, but the calculated adjusted offense level was 30, meaning the applicable guidelines sentence would be anywhere from 97 to 210 months, depending on the to-be-determined CHC. But the agreement provided "the parties will request" a 180-month sentence (upwardly variant from the 135- to 168-month range a CHC of 4 would produce, per the agreement and as the eventual PSR would also reflect), and Meléndez acknowledged the court would determine the sentence. And if the sentence ultimately imposed was 180 months or less, Meléndez agreed to waive his right to appeal.

---

[3] In this type of agreement, the government secures a guilty plea in exchange for recommending or refraining from opposing a defendant's proposed sentence, sentencing range, or sentencing factor or policy stipulation. See Fed. R. Crim. P. 11(c)(1)(B). A Type B agreement's recommendations are not binding on the court upon its acceptance of the plea. Id.

Meléndez entered his guilty plea pursuant to this agreement at the change-of-plea hearing, where the court took the plea under advisement until sentencing and again requested a PSR be submitted prior to the sentencing hearing.

Meléndez filed a thorough sentencing memorandum urging the court to accept the proposed sentencing recommendations. In his memo, Meléndez recounted his grim life story: being born as the second child of a teenage mother in an abusive relationship; growing up in public housing and consistently being exposed to violence and drug use there; leaving school at only 13 to help financially support his family; at 17, seeking out his estranged father and relocating to the continental U.S. to support his family in Puerto Rico from afar; but returning home after his father would not allow him to send his earnings back, pocketing much of that money for himself. It was at this juncture, the memo emphasized, that Meléndez "fell into a trap" and his life truly changed. Because it was then that a dejected 18-year-old Meléndez stole a car.

The memo continued: Meléndez was arrested and incarcerated alongside career criminals[4] and his "trajectory was

---

[4] Meléndez served this sentence (and some subsequent ones) at the Bayamón institution, which, he stressed, was characterized by horrific overcrowding and an environment "extremely unsafe . . . for staff and inmates alike." Morales Feliciano v. Romero Barcelo, 672 F. Supp. 591, 599 (D.P.R. 1986).

all down-hill from there."  Following a three-month term of immurement, Meléndez was released with no support or supervision. He wound up back in prison to serve what amounted to a twenty-year sentence for a string of robberies.  He left prison in late 2017 to re-enter a society devastated by Hurricanes Maria and Irma. Meléndez found employment doing manual labor as part of the island's recovery efforts, but he struggled to make ends meet and "fell into a familiar trap in search of quick cash."  And so -- in January 2018 -- Meléndez committed the instant offense conduct. In view of all of these carefully detailed circumstances, plus his medical ailments and his age (then 52), Meléndez urged in his memo that a 180-month sentence would be consistent with sentences in similar matters and accounted for and was actually above the guidelines range.

### C.  Sentencing

At sentencing, the court invited Meléndez's counsel to address the court.  Echoing the thorough narrative cogently detailed in Meléndez's sentencing memorandum, counsel took the opportunity to recount Meléndez's life story again, emphasizing the difficulties he faced in his young life, up to his first criminal conduct and his continuing "revolving door-type relationship" with the criminal justice system from there.  All of this, counsel pressed, was discussed (by the parties and with the victims) and calculated into the upwardly variant 180-month

- 7 -

sentence.  So too was "the fact that [Meléndez's] recidivism rate is likely 10 percent or under once he's released from this term of incarceration back on supervised release, when he's going to be in about his 60s."  And counsel implored the court to note that Meléndez had never had the benefits of supervised release, emphasizing that such supervision and the supportive and structured resources that go with it would help break his cycle of recidivism.

When the court asked to hear from the government, the prosecutor stated:

> The Government stands by the plea and requests a sentence of 180 months.  For purposes of the record, the victims were notified.  They selected not to be here today, and they also did not request any restitution, as detailed in the PSR.  That is the position of the Government, Your Honor.

Meléndez then allocuted, apologizing to his family and the victims and expressing his remorse.

The court began its sentencing colloquy by stating the crime to which Meléndez pled guilty.[5]  The court then calculated the offense level the same way the parties had -- 30, before

---

[5] In the interest of clarity, we note the court mistakenly stated Meléndez pled guilty as to Counts 1 and 2.  Melendez's counsel objected, specifying the plea was as to the carjacking count only, but the court again said the plea was as to Counts 1 and 2.  The record (both the accepted plea agreement and the eventual judgment) reflects otherwise -- the plea was as to Count 1 only.  On appeal, there is no argument premised upon this mix-up, so we say no more about it.

tallying criminal history points. The court recounted Meléndez's previous convictions accruing criminal history points, convictions not accruing points, and charged-but-not-convicted, acquitted, and dismissed offenses. The court found Meléndez's CHC was 4, which comes with a recommended 135- to 168-month sentencing range.

The sentencing court stated it considered the 18 U.S.C. § 3553(a) factors, the PSR, the plea agreement, Meléndez's sentencing memo, and the arguments and allocution made that day. The court recited Meléndez's age (52), education (did not complete high school), unemployment status, and history of marijuana use and medical diagnoses (which were "currently stable"). It stated it had considered, "[p]ursuant to the [§] 3553(a) factors," Meléndez's "extensive criminal history," noting some of his past conduct was similar to the offense conduct. Then the court said "[a] mere three months" after release from prison, Meléndez committed the offense conduct. "He is certain to recidivate. He has absolutely no respect for the law," the court stated, before declaring the recommended 180-month sentence "does not reflect the seriousness of the offense, does not promote respect for the law, does not protect the public from additional crimes, . . . and does not address the issues of deterrence and punishment." Warning that without "just punishment[,] society in Puerto Rico will be of the criminals, by the criminals, for the criminals," the court

- 9 -

levied a 198-month term of imprisonment, followed by five years of supervised release.

Meléndez's counsel objected to the unreasonableness of the sentence, arguing that thirty-year-old crimes were not relevant considerations. Counsel also stated, "to the extent [the] sentence was based on community-based factors or murders that may have been committed in the community, I do need to preserve an objection to that as well."

This timely appeal followed.

## II.  DISCUSSION

As we previewed at the outset, Meléndez advances two appellate issues, each taking aim at a different phase of his sentencing proceedings: (A) the government breached the plea agreement when it failed to advocate meaningfully for the negotiated 180-month sentence; and (B) the sentence is procedurally unreasonable because the court failed to consider the mitigation arguments. We take these in turn, pinning down our lenses of review and fleshing out the arguments as we go.

### A.  Plea Agreement

#### i.  Standard of Review

Meléndez "did not assert that the government breached the plea agreement during the sentencing proceedings," so our review -- as counsel for Meléndez conceded at oral argument before us -- is for plain error. United States v. Acevedo-Osorio, 118

F.4th 117, 127 (1st Cir. 2024); see also United States v. Cortés-López, 101 F.4th 120, 127 (1st Cir. 2024) (concluding plain error applied when no effort was made "to bring the purported breach to the court's attention"). To prevail under the exacting plain error lens, Meléndez must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Acevedo-Osorio, 118 F.4th at 127 (quoting United States v. Cheveres-Morales, 83 F.4th 34, 42-43 (1st Cir. 2023)).

### ii. Legal Primer

"There is no doubt whatsoever that plea agreements play an 'important role . . . in our criminal justice system.'" Cortés-López, 101 F.4th at 127 (omission in original) (quoting United States v. Frazier, 340 F.3d 5, 10 (1st Cir. 2003)). "Pleading guilty requires a defendant to waive fundamental constitutional rights associated with a trial," United States v. Castillo, 126 F.4th 791, 795 (1st Cir. 2025), and doing so is "a weighty decision for a defendant, who typically agrees to [this waiver of rights] in exchange for the government's promise to lend its 'prestige' to the . . . requested sentence," Acevedo-Osorio, 118 F.4th at 127 (quoting United States v. Velez Carrero, 77 F.3d 11, 11-12 (1st Cir. 1996) (emphasis omitted)). And this -- "protect[ing] defendants from forsaking their fundamental

- 11 -

trial rights in exchange for empty promises" and "preserv[ing] faith in the plea-bargaining process," id. -- is exactly why "'we hold prosecutors to the most meticulous standards of promise and performance' in the execution of plea agreements," Castillo, 126 F.4th at 795 (quoting Acevedo-Osorio, 118 F.4th at 127).

"Plea agreements are like contracts." United States v. Fargas-Reyes, 125 F.4th 264, 270 (1st Cir. 2025). So traditional contract principles are our guideposts as we interpret a plea agreement and the government's performance under it. Cortés-López, 101 F.4th at 128. We've described two ways the government can breach a plea agreement: (1) it can explicitly breach the express terms "by doing something that it promised not to do" or by "failing to do something that it promised to do," Acevedo-Osorio, 118 F.4th at 128 (collecting examples); and (2) it can implicitly repudiate where, even if a prosecutor technically complies with the express terms, their conduct "implicitly 'undercut[s]' the deal," id. (quoting United States v. Almonte-Nuñez, 771 F.3d 84, 89, 90 (1st Cir. 2014)). Indeed, "the government may not merely pay 'lip service' to the plea agreement, 'reaffirm[ing] a promise to the defendant out of one side of [its] mouth' but 'try[ing] to subvert it out of the other side.'" Id. (quoting Almonte-Nuñez, 771 F.3d at 91). "Such conduct does not accord with the 'implied obligation of good faith and fair dealing' that accompanies all contracts." Castillo, 126 F.4th at 795

(quoting Acevedo-Osorio, 118 F.4th at 127).

There is no "magic formula" to figure out whether a prosecutor has satisfied their duty. United States v. Gonczy, 357 F.3d 50, 54 (1st Cir. 2004). Instead, we look to the totality of the circumstances in a case-by-case approach, asking "whether the prosecutor's 'overall conduct [is] reasonably consistent with making [the promised] recommendation, rather than the reverse.'" United States v. Lessard, 35 F.4th 37, 42 (1st Cir. 2022) (quoting United States v. Canada, 960 F.2d 263, 269 (1st Cir. 1992)). "In fulfilling its side of the bargain, the government 'is not obliged to present an agreed recommendation either with ruffles and flourishes,'" Cortés-López, 101 F.4th at 128 (quoting United States v. Montañez-Quiñones, 911 F.3d 59, 65 (1st Cir. 2018)), "or 'with any particular degree of enthusiasm,' though it is improper for it 'to inject material reservations about the agreement to which the government . . . committed,'" id. (quoting Canada, 960 F.2d at 270). See also Acevedo-Osorio, 118 F.4th at 128 ("[T]he government ordinarily has no 'obligation . . . to further explain its recommendation . . . when such an obligation is not explicit in the plea agreement.'" (quoting United States v. Cruz-Agosto, 102 F.4th 20, 26 (1st Cir. 2024))); Lessard, 35 F.4th at 44 (reasoning that, unless contemplated by the plea agreement, a prosecutor has "no affirmative obligation of either advocacy or explication").

All told, our job is to assess the "net effect of the government's behavior" to determine whether it "undermine[d] the benefit of the bargain." Cortés-López, 101 F.4th at 128 (quoting Frazier, 340 F.3d at 10). This jibes with contract principles: Yes, "the government must act in good faith," but "that duty only prohibits the government from interfering with a defendant's reasonably expected benefit of the bargain." Acevedo-Osorio, 118 F.4th at 129. For the most part, "[i]t does not impose upon the government additional 'duties beyond those in the express contract or create duties inconsistent with the contract's provisions.'" Id. (quoting Metcalf Constr. Co. v. United States, 742 F.3d 984, 991 (Fed. Cir. 2014)).

This primer in tow, we proceed to our examination of whether the government's conduct at Meléndez's sentencing hearing plainly breached the plea agreement.

### iii. Our Take

Meléndez says the government breached the agreement when it failed to meaningfully advocate for and explain why the court should impose the 180-month sentence, instead paying mere lip service to the agreement.[6] He recognizes the government wasn't

---

[6] Meléndez does not squarely argue (or mention) implicit repudiation, but his theory of breach leans on the impermissible "lip service" and subversion ideas we summarized above. Given the context and the issue as he raises it, we understand his argument to include both explicit and implicit breach angles. In any event, "[w]e need not treat these theories of breach as wholly separate"

- 14 -

required to argue enthusiastically for the sentence, but, in context, he submits no impartial observer viewing the government's statement here would believe the government considered the agreed-upon sentence adequate. And the government knew, says Meléndez, the court before which the parties were appearing "was known to vary upward in virtually any firearm-involved case," and it had already signaled it was impacted by the victim's injury (remarking, "Well, one of the things that are not moving very well is the victim's face" in the course of a hearing). But "when it came time to put the prestige of the [U.S.] behind the agreed-to 180-month sentence, all the prosecutor said was, 'The Government stands by the plea and requests a sentence of 180 months,'" and this, urges Meléndez, was an unmistakable abdication of its duty to act in good faith.

Disagreeing entirely, the government says it did not breach its duty because the prosecutor complied with her obligation to unequivocally request the agreed-to sentence in accordance with the plea agreement, and -- there being no duty of advocacy and no obligation to tailor the recommendation to a particular judge -- no more was needed.

---

anyway -- "[b]ecause we assess the totality of the circumstances, we must consider both the terms of the agreement and the government's conduct, viewed holistically, to assess whether, overall, the government acted consistently with [Meléndez's] reasonable expectations." Acevedo-Osorio, 118 F.4th at 130.

- 15 -

Having carefully assessed the totality of the circumstances -- meaning, as described above, we holistically considered the terms of the plea agreement and the government's conduct to determine whether, on balance, the government acted consistently with Meléndez's reasonable expectations, see Cortés-López, 101 F.4th at 128-29 -- we spy no plain error.

The government's onus under this agreement was to "request a sentence of imprisonment of one hundred and eighty (180) months" without stipulating to a CHC. That is what happened. At sentencing, the prosecutor said she was "stand[ing] by the plea agreement and request[ing] a sentence of 180 months." She uttered no words nor exhibited any conduct suggesting the sentence recommendation was inappropriate. Looking at the "net effect of the government's behavior," we conclude Meléndez has failed to show that any aspect of the record conduct "undermine[d] the 'benefit of the bargain'" or made it seem like the prosecutor was walking back her stance on the proposed sentence. Cortés-López, 101 F.4th at 128 (quoting Frazier, 340 F.3d at 10). Instead, the prosecutor's "overall conduct [was] reasonably consistent with making [the agreed-upon] recommendation." Canada, 960 F.2d at 269; see also Fargas-Reyes, 125 F.4th at 271-72 (rejecting on plain error review a breach argument when the appellant hadn't pointed to an undeniable mistake -- he faulted the prosecutor for failing to do something the agreement didn't oblige the prosecutor to do);

Rivera-Ruiz, 43 F.4th at 180 (finding no breach under plain error review when, "[u]nder the plea agreement, the government agreed to recommend a sentence of 33 months, which is what it did"); Lessard, 35 F.4th at 43 ("[U]nder the demanding plain-error standard, the defendant has failed to show that the prosecutor's overall conduct was other than reasonably consistent with making the promised recommendation." (cleaned up)). The prosecutor discharged her duties under the agreement here in accordance with what our caselaw demands, and no plain error lies.

Resisting this conclusion, Meléndez points to what he describes as the sentencing court's penchant for upwardly variant sentences in gun cases, saying in context "more was required" here to advocate "genuine[ly]" for the sentence than offering with "terseness" a "numerical statement." True enough, these cases really are all about context. But we've studied the context carefully, and the context Meléndez cites cannot propel him to the outcome he seeks. The agreement in this case simply did not impose an "affirmative obligation of either advocacy or explication on the prosecutor"; "rather, [it] imposed an obligation to recommend a [particular] sentence." Lessard, 35 F.4th at 44; see also Cruz-Agosto, 102 F.4th at 25 (noting the government ordinarily has no "obligation . . . to further explain its recommendation . . . when such an obligation is not explicit in the plea agreement"). Likewise, the agreement did not "oblige[] [her] to present [the]

- 17 -

agreed recommendation either with ruffles and flourishes or 'with any particular degree of enthusiasm,'" Montañez-Quiñones, 911 F.3d at 65 (quoting Canada, 960 F.2d at 270), nor did it require her to "tailor her 'pitch[]'" to this particular sentencing court to account for the judge-specific concerns Meléndez raises for the first time on appeal, Fargas-Reyes, 125 F.4th at 271.[7]

---

[7] We take a moment to distinguish Meléndez's case from others where a prosecutor's silence was a real problem.

Take Cortés-López, where we held the government needed to speak up to provide some justification for its recommendation, pursuant to the plea agreement, of what appeared to be a quite lenient sentence -- 24 months' probation -- as compared to the low-end sentence of 78 months' imprisonment calculated in the PSR. 101 F.4th at 132-33. Because the parties' recommendation differed so drastically from probation's -- and because the prosecutor "announced" without solicitation "that the PSR and not the plea agreement reflected the 'correct' loss amount" for the purposes of sentencing, id. at 132 -- we reasoned the government had to offer "some minimal explanation" for the "seemingly off-kilter, well-below guidelines recommendation" and its failure to do so there was "tantamount to a repudiation of the [plea] agreement." 101 F.4th at 132, 133.

And then there's Acevedo-Osorio, where, similarly, after noting the parties agreed to recommend 120 months in prison even though the guidelines range was 292-365 months, we held the government should have given "at least a 'minimal explanation'" for "'such a dramatic downward variation,'" 118 F.4th at 132 (quoting Cortés-López, 101 F.4th at 132, 133) -- especially given the "stark narrative differences between the plea agreement and the PSR," id. at 133; see also id. at 132-33 (stressing that, given the glaring difference between the plea agreement and the guidelines range, the government's lack of explanation for such a startlingly lenient proposal left the "inevitably skeptical" judge without a clue as to "why, in the government's view, the sentence was proper").

The difference between the government's silence in those cases and what we have in Meléndez's is plain. The concerns animating our faulting the government for not speaking up and minimally explaining its position in those cases simply aren't in play here, where the 180-month sentence was already upwardly

Meléndez's reliance on Canada, 960 F.2d at 269, does not alter our conclusion. There, the government failed to affirmatively recommend the agreed-upon sentence, as it had promised to do, and in fact made it seem like it would encourage "a sentence greater than" the agreed-to one when it improperly "inject[ed] material reservations about the agreement" into the proceedings. Id. at 269-70. The prosecutor engaged in "a wink and a nod," "making only 'grudging and apologetic' comments in support of the agreed-upon sentence while stressing the need for 'a lengthy period of incarceration' and emphasizing facts that supported an enhancement not contemplated by the plea agreement." Acevedo-Osorio, 118 F.4th at 128 (quoting Canada, 960 F.2d at 269). But that is not what happened here. The prosecutor in Meléndez's case affirmatively "[stood] by" her bargained-for promise to recommend the agreed-to sentence, and in good faith -- we discern no unprompted commentary, no gratuitous comments at all.[8] Id. at

variant from the range the parties and probation calculated (135-168 months).

[8] Our implicit-repudiation-type cases generally see a prosecutor technically complying with an agreement's terms, but also saying something that can be understood as expressing some misgivings. See, e.g., Castillo, 126 F.4th at 797 (prosecutor "made multiple statements" that "[left] the unmistakable impression that the prosecutor wanted the district court" to dole out a higher sentence than the one the parties had agreed to, and that "presentation constitute[d] a clear example of paying lip service to the plea agreement while giving a wink and nod to the imposition of a harsher sentence"); United States v. Mojica-Ramos, 103 F.4th 844, 850 (1st Cir. 2024) (prosecutor called the defendant "exception[ally]" dangerous and offered ample evidence of

129 (reminding that the requirement that the government act in good faith  "prohibits the government from interfering with a defendant's reasonably expected benefit of the bargain," but "does not impose upon the government additional 'duties beyond those in the express contract or create duties inconsistent with the contract's provisions'" (quoting Metcalf Constr. Co., 742 F.3d at 991)).  In fact, the relevant substance of her stance was -- start to finish -- "[t]he Government stands by the plea and requests a sentence of 180 months."  On this record, Meléndez's attempt to shoehorn this into something more dastardly or impactful does not work.

In our searching plain error review, we conclude Meléndez has not demonstrated the government breached the plea agreement.  Rather, the prosecutor's overall conduct shows she complied with the terms of the agreement and did not undermine it. Meléndez's arguments that the prosecutor was obligated to do more in the context of his case are not supported by our caselaw.

## B.  Procedural Reasonableness

### i.  Standard of Review

The parties do not see eye-to-eye on how we should review

---

uncharged criminal conduct); Gonczy, 357 F.3d at 54 (prosecutor seemingly stood by the recommendation but stressed the harmful consequences of the defendant's acts so much that no "impartial observer [would] think that [the government] thought [the agreed-upon sentence] was . . . adequate").  Meléndez's record does not reflect any of these hallmarks of implicit repudiation.

the reasonableness of the 198-month sentence.  The government says Meléndez's arguments should be subjected to plain error review (at best) because his objections at sentencing don't line up with his appellate contentions (and we'll get into the details of those assertions momentarily), thus failing to satisfy preservation requirements.  See United States v. Colón-Cordero, 91 F.4th 41, 49 (1st Cir. 2024) (explaining our preservation rules and the impact of preservation (or the lack thereof) on the lens of review).  But in his reply brief, Meléndez implores us to give this issue the abuse-of-discretion treatment.  In view of our commonsense, in-context approach to sentencing-error preservation, he submits it's clear his "thematic protestations" put the court on notice of the error.  Id. at 50.

Because our careful review of the merits has inexorably led us to conclude Meléndez's procedural reasonableness argument fails whether we scrutinize for plain error or abuse of discretion, we will deploy the slightly more appellant-friendly lens to his arguments.  See United States v. De La Cruz, 91 F.4th 550, 554 n.4 (1st Cir. 2024) (taking the same approach and applying abuse of discretion to give appellant "the benefit of the doubt").

Just a few more words on the standard before we apply it.  By comparison to the plain error gauntlet, abuse of discretion is, as we just wrote, slightly more friendly to appellants.  But make no mistake:  No one would describe abuse of discretion as

- 21 -

appellant-friendly in a vacuum.  Quite the opposite.  See United States v. Marino, 833 F.3d 1, 7 (1st Cir. 2016) ("The abuse-of-discretion standard is not 'appellant-friendly,' to put it mildly . . . .").  Its application in the procedural reasonableness context requires us to "engage[] in a multifaceted [review] whereby 'we afford de novo review to the sentencing court's interpretation and application of the sentencing guidelines, [examine] the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion.'"  United States v. Maldonado-Peña, 4 F.4th 1, 55-56 (1st Cir. 2021) (first and third alterations in original) (quoting United States v. Arsenault, 833 F.3d 24, 28 (1st Cir. 2016)).  "[W]e will find an abuse of discretion only when left with a definite conviction that 'no reasonable person could agree with the judge's decision.'"  Id. at 56 (quoting United States v. McCullock, 991 F.3d 313, 317 (1st Cir. 2021)).  And "[a]ppellate review of federal criminal sentences is characterized by a frank recognition of the substantial discretion vested in a sentencing court."  United States v. Ortiz-Pérez, 30 F.4th 107, 112 (1st Cir. 2022) (quoting United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013)).

## ii.  Legal Primer

Meléndez's challenge -- that the court erred when it did not expressly discuss the mitigation arguments he offered at

- 22 -

sentencing or explain why it rejected them -- takes aim at the procedural reasonableness of his sentence, so this primer focuses on the precedent that helps us tackle just such an argument.

One of the ways a sentence can be procedurally unreasonable is if a court "fail[s] to consider the § 3553(a) factors." Gall v. United States, 552 U.S. 38, 46, 51 (2007). That's because a sentencing court must always conduct an "individualized assessment" of those factors -- including a defendant's history and characteristics -- based on the facts of any given case. Id. at 50. "How to weigh the § 3553(a) factors falls inside a sentencing court's 'informed discretion.'" Colón-Cordero, 91 F.4th at 51 (quoting United States v. García-Pérez, 9 F.4th 48, 52 (1st Cir. 2021)). "It is the sentencing court's prerogative -- indeed, its duty -- to 'draw upon [its] familiarity with a case, weigh the factors enumerated in [section] 3553(a), and custom-tailor an appropriate sentence.'" Ortiz-Pérez, 30 F.4th at 112 (quoting Flores-Machicote, 706 F.3d at 20). That said, "[w]e do not require sentencing courts to deliver a 'rote incantation' of each factor, and we do not expect them to apply equal weighting across factors." Colón-Cordero, 91 F.4th at 51 (quoting United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006)); Ortiz-Pérez, 30 F.4th at 112 (providing that we do not "disturb a sentencing court's reasoned decision to weigh some factors more heavily than others" (quoting United States v.

Vélez-Andino, 12 F.4th 105, 117 (1st Cir. 2021))).

"We likewise do not require a sentencing court to 'address every argument that a defendant advances in support of his preferred sentence.'" Colón-Cordero, 91 F.4th at 51 (quoting United States v. Rivera-Morales, 961 F.3d 1, 19 (1st Cir. 2020)). And "[w]hen a sentencing court explicitly notes that it considered all the § 3553(a) factors, we will take that into consideration." Id.; see also United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011) ("Such a statement 'is entitled to some weight.'" (quoting United States v. Dávila-González, 595 F.3d 42, 49 (1st Cir. 2010))).

We've also explained that "when it isn't readily apparent in as many words, we sometimes are able to infer that a sentencing court weighed relevant factors in explaining its pronouncement." Colón-Cordero, 91 F.4th at 51.

### iii. Our Take

Meléndez asseverates that the court erred when it did not expressly consider his heavily emphasized mitigation arguments, which chronicled the unfortunate circumstances of his life, or explain why it rejected those arguments. He says he presented significant evidence of (1) his difficult childhood, including exposure to corrupting influences in his neighborhood and in prison, (2) his enduring incarceration, rather than supervision and assistance, and (3) the deplorable prison

conditions he suffered, which left him ill-equipped to re-enter society. The failure to explain why these circumstances did not mitigate the offense or were outweighed by other considerations constitutes procedural error, he urges.

For its part, the government argues the court followed the appropriate sentencing procedure -- it was clear the court reviewed everything that detailed Meléndez's mitigating history and characteristics, but simply landed on a sentence that displeases Meléndez. According to the government, Meléndez's arguments were unconvincing, not ignored.

The government has the better argument. We unpack why that is so, starting with a recap of what the court said and did, interspersed with some of the legal principles we just mentioned.

Recall that the court started its sentencing work by stating the crime to which Meléndez pled guilty, then calculated the adjusted offense level. The court looked to Meléndez's previous convictions and rehearsed the charged-but-not-convicted, acquitted, and dismissed offenses. The court explained that it considered the § 3553(a) factors (a statement that certainly isn't the be-all-end-all, but is owed "some weight," Clogston, 662 F.3d at 592 (quoting Dávila-González, 595 F.3d at 49)), the PSR, the plea agreement, Meléndez's sentencing memo, and the arguments and allocution made at the hearing (remember, counsel described in detail Meléndez's life story at sentencing, both in his submitted

memo and at the hearing). And, as we read this record, it weighed Meléndez's background and "extensive criminal history" (specifically noting some of his past conduct was similar to the offense conduct), as well as the fact that "[a] mere three months" after his release from prison, Meléndez committed the carjacking. The court assessed that Meléndez was "certain to recidivate," described community characteristics, then explained the 180-month sentence "does not reflect the seriousness of the offense, does not promote respect for the law, does not protect the public from additional crimes, . . . and does not address the issues of deterrence and punishment." So the court, in its discretion, rejected the 180-month recommendation and, in its stead, levied a 198-month term of imprisonment, followed by a five-year term of supervised release.

To highlight what he calls error in all of this, Meléndez relies on Colón-Cordero, 91 F.4th at 41, which came out after his opening brief was submitted and just before his reply was filed. But that case is not the salve he would wish to be the healing balm.

On the facts of that case, ever mindful of the above-recited principles, we vacated an upwardly variant sentence in part[9] because the court neither engaged at all with the "dominant

---

[9] The Colón-Cordero court also had to confront a challenge to the overall adequacy of the court's sentencing explanation,

mitigation argument" (Colón's intellectual disability) nor "[said] enough from which we could fairly infer how it felt about [it]." Id. at 55, 56. "[G]iven Colón's paramount emphasis on this individual characteristic as the mitigation argument," we wrote, "the sentencing court should have engaged with it." Id. at 55.

There are similarities between these cases, to be sure. In both, the same sentencing court said nothing explicit about the mitigation arguments, but it signaled it had read the sentencing memorandum and PSR (in which Meléndez's mitigating history and characteristics were detailed), heard arguments from defense counsel (which repeated Meléndez's mitigating history and characteristics), and said it considered the § 3553(a) factors.

Be that as it may, there are important differences that distinguish these cases in ways that impact their analyses.

For starters, Meléndez's mitigation arguments (yes,

---

embedded within which was the attack on the court's ignoring the mitigation argument. 91 F.4th at 50 (describing "correlated attacks on the adequacy of the court's explanation for its upward variance in the new criminal conduct case and its failure to address the mitigating evidence of Colón's intellectual disability"). Meléndez, on the other hand, focuses his procedural-reasonableness challenge on the mitigation arguments he says went ignored and, as part of that, the court's failure to explain why it was unmoved by them (not a failure to explain the sentence as a whole).

These can be interrelated, it's true, but our caselaw treats them as distinct types of sentencing challenges. We do not read Meléndez's papers as advancing a more sweeping inadequate-explanation attack as part of a layered challenge like the one this court faced in Colón-Cordero.

plural) are more far-reaching and multidimensional than what we saw in Colón-Cordero. In Colón-Cordero, the court said nothing about "the mitigating individual characteristic [(Colón's intellectual disability)] and the argument about it" that was pressed throughout sentencing with "paramount emphasis." 91 F.4th at 55. By contrast, here, the mitigating characteristics are (1) Meléndez's rough childhood, in his neighborhood and in prison; (2) his recurring incarceration as a child; and (3) the deplorable conditions in prison. The argument goes that these different characteristics should mitigate his offense because he had no family support or supervision, he was ill-equipped to re-enter society each time he tried, and he lacked access to rehabilitation. Meléndez strains to refer to all of this as his "primary" mitigation argument, but the list (yes, list) of different mitigation considerations -- an enumerated register of three categories of potentially mitigating evidence -- demonstrates that Meléndez's is not "the" single mitigation argument situation we saw in Colón-Cordero. Cf. United States v. Reardon, 111 F.4th 148, 149, 150 (1st Cir. 2024) (distinguishing Colón-Cordero "readily" (on plain error review) in part because "none of the allegedly mitigating factors that the appellant alluded to were so singularly forceful").[10]

---

[10] We do not downplay the evidence of Meléndez's difficult life as described here. Each of the listed descriptions is

Also worth noting is that we strived in Colón-Cordero to explain the arguments there did not fall under the typical headers we see in appeals focusing on mitigating factors, like where a "court quite clearly addressed certain things, but an appellant nonetheless complains it did not," "a defendant attempts to superimpose his own preferred weighing of the sentencing factors," or "a defendant trains his gaze on a sentencing court's failure to address one of his arguments -- when our caselaw is clear" that is not required.  91 F.4th at 54, 55 (collecting examples of these types of appeals).  We labored so because it was important to make it clear how unique Colón's argument was:  He wasn't "complaining about how a bunch of important mitigating factors were discarded or weighed wrong; he [wasn't] arguing that some of his arguments were given short shrift or misunderstood."  Id. at 55.  Rather, "[h]is position [was] that the mitigating individual characteristic and the argument about it were completely ignored."  Id.

Try as he might to convince us otherwise, the same cannot

troubling and demonstrative of the cyclical issues we see all too often in criminal matters -- difficult upbringings becoming a pipeline into criminal conduct from a young age and chronic incarceration in lamentable conditions.
Our point today is an analytical one, not a qualitative one: Meléndez is trying to package up a bundle of different examples of potentially mitigating evidence and call it a single characteristic and argument.  But his mitigation-related arguments are too wide-ranging and multifaceted to get the Colón-Cordero "dominant mitigation argument" treatment.

be said for Meléndez's arguments on appeal, which fall under one or two of those typical headers we just recited: preferring his own weighting of various examples of potentially mitigating evidence, see, e.g., United States v. Ruperto-Rivera, 16 F.4th 1, 6 (1st Cir. 2021) (rejecting a mitigating-factors challenge when the "plaint boil[ed] down to a lament that the court did not weigh the aggravating and mitigating factors as counsel would have preferred"); or taking issue with the court not directly addressing these arguments when, as we've explained, a court need not "address every argument that a defendant advances in support of his preferred sentence," Rivera-Morales, 961 F.3d at 19; see also United States v. Díaz-Lugo, 963 F.3d 145, 152 (1st Cir. 2020) (reasoning that "a sentencing court need not speak to a defendant's arguments one by one and expressly dispose of each of them").

Bound up in this is another difference between Colón-Cordero and Meléndez's case, and it has to do with inferences. "[W]hen it isn't readily apparent in as many words, we sometimes are able to infer that a sentencing court weighed relevant factors in explaining its pronouncement." Colón-Cordero, 91 F.4th at 51. In Colón-Cordero, we couldn't reasonably infer the court's thinking to backfill the gaps we saw relative to the "dominant" argument not being mentioned. Id. at 56 ("[T]he court did not say enough from which we could fairly infer how it felt about Colón's dominant mitigation argument."). But while we did

not have enough there to draw a fair inference, the record here is different.

Unlike Colón-Cordero, Meléndez's is a case where we can infer the sentencing court's reasoning "'by comparing what was argued by the parties or contained in the [PSR] with what the judge did,'" and our inferences here are reasonably "anchored in 'what the judge did'" at sentencing. United States v. Carrasquillo-Sánchez, 9 F.4th 56, 62 (1st Cir. 2021) (quoting United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc)). There are several facets of mitigating circumstances here, spanning the entirety of Meléndez's life; on this record, to believe the sentencing court completely ignored these (when they had been so carefully detailed in the PSR, sentencing memo, and argued by counsel at the hearing) blinks reality -- the mitigating characteristics and arguments are Meléndez's life story. In what we reasonably infer to be a counterbalancing response to that simple truth and the arguments before it, the court explained Meléndez was a demonstrated recidivist with an "extensive criminal history" (including conduct similar to the offense conduct), the victim was still suffering from the effects of Meléndez's crime, and, on balance, as the court discretionarily determined, interests like protecting the public, deterrence, and punishment would be better served by a higher sentence than the one the parties proposed.

So yes, it is true, as Meléndez points out, that the court didn't explicitly mention his mitigation arguments. But Meléndez's "potentially mitigating factors were before the district court at sentencing" and, on this record, "[t]here is not the slightest reason to think that the district court overlooked them." United States v. Cortés-Medina, 819 F.3d 566, 570-71 (1st Cir. 2016); Ruperto-Rivera, 16 F.4th at 6 ("That the court did not explain in exquisite detail why it chose to afford relatively little weight to the factors that the appellant advanced in mitigation is not the sort of stuff out of which a claim of sentencing error can be constructed."). (And it bears repeating here: We do not require sentencing courts to mention every argument, anyway. See Cortés-Medina, 819 F.3d at 571 ("[W]e discern no abuse of discretion in the sentencing court's failure to acknowledge explicitly that it had mulled the defendant's arguments.").) As we've also explained, and as is very much the case here, "[w]hen a defendant has identified potentially mitigating sentencing factors and those factors are thoroughly debated at sentencing, the fact that the court 'did not explicitly mention them during the sentencing hearing suggests they were unconvincing, not ignored.'" Díaz-Lugo, 963 F.3d at 152 (quoting United States v. Lozada-Aponte, 689 F.3d 791, 793 (1st Cir. 2012)); see also United States v. Santa-Soler, 985 F.3d 93, 99 (1st Cir. 2021) (cautioning that "it is incorrect to assume . . . that [a

- 32 -

defendant's] failure to persuade the court to impose a more lenient sentence implies that the mitigating factors he cites were overlooked").

As we warned earlier, we will not "disturb a sentencing court's reasoned decision to weigh some factors more heavily than others." Ortiz-Pérez, 30 F.4th at 112 (quoting Vélez-Andino, 12 F.4th at 117); see also United States v. Santiago-Rivera, 744 F.3d 229, 233 (1st Cir. 2014) (finding no procedural error even though "[t]he court weighed the aggravating factors more heavily than the mitigating factors"). So it is here.

For these reasons, we spy no abuse of the court's considerable discretion. The sentence is procedurally reasonable.

### III. CONCLUSION

In accordance with the foregoing analysis, we affirm.